UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE YONGYE INTERNATIONAL, INC. SECURITIES LITIGATION | Civil Action No. 11 Civ. 3616 (RJS) **(Consolidated)**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiffs Patricia Horne, Merton Horne and Scott Whitehead, on behalf of themselves and all other persons similarly situated, by their undersigned attorneys, allege the following based upon their own personal knowledge as to their own acts, and upon information and belief as to all other matters, founded on the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls, analyst reports, and press releases; interviews with former employees; announcements made by defendants, and filings made with the United States Securities and Exchange Commission ("SEC"); and other information readily available on the Internet. Lead Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Yongye International, Inc. ("Yongye" or the "Company") between August 11, 2010 and May 19, 2011, inclusive (the "Class Period"), against Yongye and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"). These claims are asserted against Yongye and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

3.       Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made into or issued from this District, and Yongye's subsidiary, YNFB, is audited by a New York-based auditing firm. Yongye is headquartered in Beijing, China.

4.       In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. Yongye stock trades in an efficient market on the NASDAQ Global Market.

## PARTIES

5.       By Order dated September 23, 2011, the Court appointed Patricia Horne, Merton Horne, and Scott Whitehead as Lead Plaintiffs. As set forth in their certifications, which were previously filed in this action and are incorporated herein by reference, Lead Plaintiffs purchased Yongye common stock during the Class Period and were damaged thereby.

6.       Defendant Yongye, through its primary operating subsidiary, Yongye Nongfeng Biotechnology Co., Ltd. ("YNFB"), which is a 95% owned subsidiary of Yongye, engages in the manufacturing, research and development and sale of fulvic acid-based liquid and powder nutrient compounds used in the agriculture industry in the People's Republic of China ("PRC"). The Company manufactures and sells two principal products, which are plant product and animal product. Pursuant to a cooperative joint venture agreement Yongye is entitled to 95% of the profits of YNFB, and another company, Inner Mongolia Yongye Biotechnology Co., Ltd. ("Inner Mongolia Yongye") is entitled to 5% of the profits.

7.       Defendant Zishen Wu ("Wu") is, and at all relevant times was, Chairman of the Board and Chief Executive Officer ("CEO") of Yongye. Defendant Wu signed the Company's Forms 10Q and 10-K that were filed with the SEC during the Class Period.

8.     Defendant Sam Yu ("Yu") is, and at all relevant times was, Chief Financial Officer ("CFO") of Yongye. Defendant Yu signed the Company's Forms 10Q and 10-K that were filed with the SEC during the Class Period.

9.     Defendants Wu and Yu (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Yongye's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

10.     Defendants are liable for: (i) making false statements or (ii) failing to disclose adverse facts known to them about Yongye. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Yongye common stock was a success, as it: (i) deceived the investing public regarding Yongye's prospects and business, (ii) artificially inflated the price of Yongye common stock, and (iii) caused Lead Plaintiffs and other members of the Class to purchase Yongye common stock at inflated prices.

## CLASS ACTION ALLEGATIONS

11.     Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Yongye common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

12.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Yongye has over 50 million shares of stock outstanding, owned by hundreds of persons.

13.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Yongye common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

14.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from defendants' wrongful conduct.

15.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

- 4 -

16.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

17.     Yongye is engaged in the manufacturing, research and development, and sale of fulvic-acid-based liquid and powder nutrient compounds used in the agriculture industry in the PRC. The Company manufactures and sells two principal products, which are plant product and animal product. The Company's universal liquid plant product, known as Shengmingsu, consists of its fulvic-acid-compound base mixed with additional nutrients that plants typically need to grow. It is applied to various types of crops by mixing with water and spraying directly on the plants, typically in conjunction with normal fertilizer and pesticide usage. Its animal product is a powder and consists of its fulvic-acid-base compound mixed with other nutrients and Chinese herbs.

18.     Yongye became a publicly traded company by means of a reverse merger. In April 2008, Yongye merged into a Nevada corporation called Golden Tan, Inc. ("Golden Tan"). Golden Tan was a mobile tanning company incorporated in 2006. However, Golden Tan had no operations in 2008 when Yongye merged into Golden Tan and changed its name to Yongye Biotechnology International, Inc. Through this reverse merger, Yongye was able to become a publicly traded company in the United States without going through the rigors of SEC approvals.

### Serious Concerns Are Raised About Yongye's Public Statements

19.     Although the Company issued numerous positive statements during the Class Period regarding its business and the effectiveness and benefit of Shengmingsu, its main product, an investigation by various analysts, as well as by Lead Plaintiffs' investigators, indicates otherwise.

20.     For example, on February 6, 2011, an analyst named Ian Bezek published an article on the popular financial website Seeking Alpha (www.seekingalpha.com) critical of Yongye, describing it as "an odd and peculiar story of a company with a murky past and an uncertain future."

He first questions how Yongye is able to sell a commodity such as fulvic acid for "sky-high margins that have driven Yongye's frenetic expansion" since commodities typically have low profit margins. He further notes that "according to highly respected Western research institutes," fulvic acid (which is the water-soluble portion of humic acid) – "just doesn't work" to increase crop productivity and several university scholars have referred to this type of soil additive as "snake oil."

21.     These concerns were added to in a follow-up report by Mr. Bezek on March 23, 2011, in which he again questioned the veracity of Yongye's Class Period representations. Specifically, Mr. Bezek noted that the quality of Yongye's earnings was suspect because, among other things, the ordering pattern from the Company's distributors was highly irregular:

> [i]n the 3rd quarter of 2007, the Hebei distributor bought $583k of product, in 3rd quarter of 2008, it bought $11.8M of product (a 2000% increase), in 3rd quarter 2009, it only $3.7M of product (a more than 60% decline), then in 3rd quarter 2010, Hebei's sub-distributors bought somewhere close to 428% more than $3.7M from Yongye's newly-acquired provincial level distributor (exact number unavailable; Yongye doesn't seem to have reported it).

As Mr. Bezek noted, "A retail model should result in steadily rising sales . . . , not wild swings in distribution from year to year. A 60% year over year decline in Hebei sales (2009 to 2008) does not make sense given the company's retail model."

22.     Mr. Bezek also questioned Yongye's failure to sufficiently identify individual distributors so that investors would be able to deduce and compare distributor data:

> Why would the company not release this information? One reason would be to obscure the fact that the company's sales apparently wildly fluctuate among distributors with huge spikes and large declines that cannot be explained due to seasonality. This brings into question the quality of Yongye's earnings.

23.     While the Company issued press releases in response to both of Mr. Bezek's reports, its responses, dated February 7, 2011 and March 24, 2011, respectively, were inadequate and failed to sufficiently allay investors' concerns.

24.     Indeed, on May 18, 2011, Kevin Barnes, an analyst at Absaroka Capital Management, issued a scathing report with a "Conviction Sell" recommendation. His view was summed up in the report's very first sentence: "Yongye International Inc. is a fraud." In echoing some of the concerns previously raised by Mr. Bezek, in addition to several new ones, Mr. Barnes stated that his report "will present irrefutable evidence that Yongye has fraudulently misrepresented its business. . . ."

25.     Specifically, Mr. Barnes noted, among other things, that:

(a)     The Company's acquisition of the rights to explore, develop and produce lignite coal resources in Wuchuan County for $35 million in cash was suspect and appears to be a scheme to transfer funds out of the Company at the expense of the shareholders;

(b)     The Company's intertwined relationships with its two largest suppliers appear to allow the Company to fraudulently manipulate earnings;

(c)     The Company's acquisition of a customer list from Hebei Province for $32.3 million is suspicious, has limited industrial logic and appears to be part of a scheme to falsely manipulate earnings; and

(d)     Yongye's claims about its main product, Shengmingsu, are exaggerated since it is minimally effective for farmers.

26.     Over the next two days, as investors began to digest the information contained in this report, shares of Yongye stock dramatically declined, falling 34% from their intraday high on May 17, 2011.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

27.     The Class Period begins on August 11, 2010. On that date, Yongye filed its Form 10-Q with the SEC for its second quarter 2010. The Company reported net income of $25.5 million, or $0.54 diluted EPS, and net sales of $89.4 million. The Form 10-Q stated in part:

**Net Sales**

Sales of $89,414,388 in the second quarter of 2010 was an increase of $43,142,844 from $46,271,544 in the same period of 2009, which was an overall increase of 93%.

*     *     *

In March 2010, Yongye Nongfeng signed a preliminary agreement with a local supplier of humic acid to purchase an undeveloped lignite coal resources project in Inner Mongolia, PRC. Consummation of the acquisition requires the satisfaction of certain customary closing conditions, including receipt of governmental approval. *The preliminary agreement with Wuchuan Shuntong Humic Acid Trading Company Limited ("Shuntong") provides for the acquisition of Shuntong's development rights to a currently undeveloped lignite coal resource project located in Wuchuan County, a suburb located outside the city of Hohhot, Inner Mongolia,*[1] where the Company's major operations reside in the PRC. According to a third party valuation report, the project area is estimated to contain over 40 million cubic meters of surface level lignite coal which can supply the Company's long-term needs. According to the agreement, Nongfeng will pay Shuntong RMB240 million ($35.1 million) to acquire the development rights for this project. In addition to this, Nongfeng plans to build a new factory with 20,000 tons of plant nutrient product and 10,000 tons animal nutrient product annual capacity in a nearby economic development zone located near the coal resources project. This acquisition will not be completed until Nongfeng makes full payment to Shuntong and receives in return the full, unencumbered title to the development rights. Nongfeng is still in the process of obtaining the related titles and expects to complete the transaction by the end of 2010.

In June 2010, Yongye Nongfeng entered into an agreement to acquire the Shengmingsu distribution network from its provincial level distributor in Hebei Province *which is solely comprised of a customer list*, which was completed in July 2010. The Company has issued 3.6 million shares of common stock and will pay an additional $3.0 million in cash to the seller by March 2011, as consideration for the acquisition. The Company has commenced to trade with these customers in July 2010. The customer list is comprised of all of the sub-provincial level distributors who sell the Company's Shengmingsu plant and animal nutrient products to over 2,700 branded stores located in Hebei Province, which is Yongye's largest regional market in China, representing approximately 30% of the Company's revenues in 2009. Previously, in Hebei Province, Yongye sold its products to its provincial level distributor who then resold those products to lower level distributors and on to the branded stores. *After the acquisition of the customer list, Yongye will sell directly to*

---

[1]    Emphasis has been added, unless otherwise noted.

*its sub-provincial level distributors in Hebei Province and these distributors will sell directly to the retail network.*

28.     The statement referenced above in ¶27 that Yongye will "sell directly to its sub-provincial level distributors in Hebei Province" . . . "after the acquisition of the customer list" was materially false and misleading because Yongye failed to disclose that it already had access to the identities of at least 500 distributors at a Hebei provincial product launch that took place *before* the customer list of distributors was purchased, thereby rending the purchase of the customer list superfluous.  The statements made regarding the agreement with Wuchuan Shuntong were also materially false and misleading because they failed to disclose that the Wuchuan Shuntong transaction was not legitimate and appears to be a scheme to transfer funds out of the Company at the expense of public shareholders.

29.     On August 13, 2010, the Company hosted a conference call with investors to discuss the Company's financial performance.  On the call, CFO Yu commented on the recent acquisition of a list of customers that the Company had acquired for approximately $32.3 million (mostly paid for in newly-issued Yongye stock):

> In July we acquired a Shengmingsu distribution network from our primary distributor in Hebei province which is solely comprised of the customer list.  To fund the transaction we issued 3.6 million shares of common stock in July 2010 to the seller and will pay additional 3 million in cash.  The shares issued are subject to a six month lockup period.  Our customer list is comprised of all the sub-provincial distributors who serve the company's Shengmingsu plant animal product and nutrient product to over 2,700 independent Yongye branded stores located in Hebei province which is our largest regional market in China representing approximately 30% of our revenue in 2009.

> \*       \*       \*

> *We believe acquisition of the Shengmingsu customer list from our largest distributor makes both strategic and financial sense*.  This acquisition is another step in our vertical strategy and provides us with increased visibility into our Shengmingsu business at the local level.

30.     The statement referenced above in ¶29 was materially false and misleading because the acquisition of the customer list did not make "both strategic and financial sense" since defendants failed to disclose that Yongye already had access to the identities of at least 500 distributors at a Hebei provincial product launch that took place *before* the customer list of distributors was purchased, thereby rending the purchase of the customer list superfluous.

31.     On November 16, 2010, Yongye hosted a conference call for investors to discuss the Company's financial performance for its third quarter of 2010.  On the call, Larry Gilmore, Yongye's vice president of corporate strategy, commented on the effectiveness of Shengmingsu:

> This growing demand is a testament to *the effectiveness of both our scalable business model* and the *ability of our Shengmingsu plant nutrient product in helping farmers increase crop yields* thereby providing them with a compelling return on investment.

32.     The statement referenced above in ¶31 was materially false and misleading because Fulvic acid, the main active ingredient in Yongye's products, is minimally effective and the product claims do not correspond with reality.

33.     On February 6, 2011, an analyst, Ian Bezek, posted an unfavorable article on *Seeking Alpha* entitled *Yongye International: Why This Stock's Story Is Too Good To Be True*. The article questioned, among other things, the effectiveness of Yongye's principal product Shengmingsu:

> [F]ulvic acid just doesn't work, according to highly respected Western research institutions. I could write for pages citing studies, but . . . I'll only cite one. UC-Davis released a report printed in 2010 by the reputable HortScience journal documents the latest research in humic acids (fulvic acid is simply a water-soluble portion of a humic acid). In the report titled, "*Humic Substances Generally Ineffective in Improving Vegetable Crop Nutrient Uptake or Productivity*," the authors wrote (emphasis added),
>
> > Field trials were conducted in 2008 and 2009 evaluating the effects of pre-transplant soil application of HA at 1.1 or 3.4 kgha–1 a.i. on growth, nutrient uptake, and fruit yield of processing tomato (Lycopersicon esculentum Mill.). In neither year was macro- or

micronutrient uptake increased with HA. **Similarly, there was no significant HA effect on plant dry mass accumulation or fruit yield. We conclude that, at typical commercial application rates in representative field soils, HA is unlikely to significantly improve vegetable crop nutrient uptake or productivity.**

While I could not find a single Western study to support the use of humic or fulvic acids in increasing crop productivity, I did find several university scholars who referred to these soil additives as "**snake oil.**"

34.      The next day, following publication of this report, the price of Yongye shares declined more than 10% on 3.2 times the average daily volume.

35.      Also on that next day, in response to Mr. Bezek's article, Yongye issued a press release in which it claimed that Shengmingsu "has been demonstrated to have a significant impact on the yield and quantity of a wide variety of agricultural products in China." To back up this claim, Yongye stated that the "Chinese government's Inner Mongolia Autonomous Region Scientific and Technology Bureau thoroughly reviewed scientific and economic data provided by the Company and reached the opinion that our liquid plant product effectively increases agricultural output, improves the utilization rate of fertilizer, enhances a plant's resistance to disease and has a lighter weight and higher bio-activity than the other products it tested." Yongye also stated that the benefits of fulvic acid-based plant nutrients have been supported by academic literature, including an article by Dr. Robert Petit of Texas A&M University.

36.      These responses, however, failed to dispel the concerns raised by Mr. Bezek because, among other things: (i) the governmental bureau did not test the product and gather its own unbiased data. By Yongye's own admission, the Bureau was simply reviewing data provided by Yongye; and (ii) Yongye's statement about Dr. Petit's article is misleading because Dr. Petit retired in 1992 from Texas A&M, the article was not peer-reviewed and also cannot be found on Texas A&M's website.

Moreover, Dr. Petit's credibility is of concern since he now seems to be extolling the strange theory of "physical body ascension" (*see* www.ascensionpaths.com).

37.    In a February 8, 2011 press release, defendant Wu also praised Shengmingsu's effectiveness, stating, in pertinent part, as follows:

> "We are very confident that ***our plant nutrient product will bring important benefits to the crops in drought areas***," stated Mr. Zishen Wu, Chief Executive Officer of Yongye International, Inc. "Many regions in China have experienced drought in the past several years and our growth to date was partly due to the anti-natural disaster feature of our Shengmingsu product. In recent months we have continued to see strong demand from our distributors, who are actively promoting our products as an ***effective nutrient product*** for local farmers to counteract the drought."

38.    The statements referenced above in ¶37 were materially false and misleading because Fulvic acid, the main active ingredient in Yongye's products, is minimally effective and the product claims do not correspond with reality.

39.    On March 23, 2011, *Seeking Alpha* posted another unfavorable article by Ian Bezek, entitled *Yongye's Recent Filings Raise Various Red Flags*. The article questioned, among other things, the quality of Yongye's earnings:

> Sales from Hebei were 20 million in 2008, and 29 million in 2009, and 61 million in 2010. So how could sales have soared 428% in the second-half of 2010 versus the second-half of 2009? It seemed impossible, however further research found that sales had first dropped sharply, making the 428% increase less impressive. In the 3rd quarter of 2007, the Hebei distributor bought $583k of product, in 3rd quarter of 2008, it bought $11.8M of product (a 2000% increase), in 3rd quarter 2009, it only $3.7M of product (a more than 60% decline), then in 3rd quarter 2010, Hebei's sub-distributors bought somewhere close to 428% more than $3.7M from Yongye's newly-acquired provincial level distributor (exact number unavailable; Yongye doesn't seem to have reported it).

> I can understand some volatility in distribution ordering, however, this level of fluctuation is inconsistent with Yongye's reported network of retail stores. A retail model should result in steadily rising sales (note that since I used the same quarter's data for each year, seasonal demand changes are not an acceptable explanation), not wild swings in distribution from year to year. A 60% year over year decline in Hebei sales (2009 to 2008) does not make sense given the company's retail model. Other provinces including Inner Mongolia and Xinjiang had bizarre changes in sales

volume inconsistent with the steadily-rising top line revenue growth Yongye International has reported.

The article also questioned Yongye's failure to sufficiently identify individual distributors so that investors can deduce and compare distributor data:

> Why would the company not release this information? One reason would be to obscure the fact that the company's sales apparently wildly fluctuate among distributors with huge spikes and large declines that cannot be explained due to seasonality. This brings into question the quality of Yongye's earnings. If their distributors sometimes order great quantities and other times hardly anything, it is hard to make solid projections about future earnings and cash flow. This could explain the company's unwillingness to offer a dividend, its need to raise so much more capital in 2009, and its surging accounts receivables and inventories. Yongye's distribution network remains a great mystery to its investors. Yongye should return to its old practice of reporting sales by province quarterly and also explain the reasons why its sales to specific distributors used to (still do?) swing so violently from quarter to quarter and year to year.

The article also questioned Defendant Wu's glaring conflict of interest in serving as executive of two companies that compete against one another:

> CFO Mr. Yu stated that CEO Mr. Wu is also head of the Yongye Group, and that the Yongye Group is introducing new products in the agriculture industry that are separate from Yongye International's products. It would seem to be a glaring conflict of interest for a CEO to run two companies that compete directly with each other. Mr. Yu stated that the CEO Mr. Wu spent 95% of his time on Yongye International's affairs rather than the Yongye Group's affairs -- however, this is hard to believe since the Yongye Group operates so many different businesses including agriculture products, eco-tourism, and hotels that would seem to require a good deal of management attention.

40.    On this news, Yongye's share price declined 16.4% (from $6.34 as of close on March 22 to an intraday low of $5.30 on May 23) on 4.1 times the average trading volume.

41.    On March 24, 2011, Yongye issued a press release responding to the article.  In response to the article's claim that Mr. Wu has a conflict of interest, Yongye states, "The fact is that the Mr. Zishen Wu, the Company's Chairman and Chief Executive Officer owns other companies. That is not a secret. . . .  Yongye International's business is focused on Shengmingsu products and

- 13 -

has no conflict with the other businesses under the Yongye Group Name.  Yongye International has

a separate management team.  Mr. Wu spends almost 100% of his time on Yongye International."

42.     However, these statements failed to adequately address the concerns raised by Mr.

Bezek because, according to Yongye's own filings, in addition to being Chairman and CEO of

Yongye, Mr. Wu is also the Chairman and CEO and majority owner of another company called

Inner Mongolia Yongye, which is entitled to 5% of YNFB's (the joint venture's) profits.  Yongye

has not adequately explained how Mr. Wu can spend almost 100% of his time on Yongye's business

when he is also Chairman and CEO of Inner Mongolia Yongye – a company that is not a subsidiary

of Yongye.  Nor does Yongye explain another apparent conflict of interest:  While shareholders of

Yongye have not yet received any dividends, Mr. Wu, as 91.7% owner of Inner Mongolia Yongye, is

entitled to what is effectively a perpetual 4.59% dividend (*i.e.*, Inner Mongolia is entitled to 5% of

Yongye's profits, and Mr. Wu owns 91.7% of Inner Mongolia).

43.     Indeed, on May 18, 2011, Kevin Barnes, an equity analyst at Absaroka Capital,

voiced further concern about Yongye through a scathing report on the Company with a

recommendation of "Conviction Sell", entitled *Yongye International, Inc. – Putting the Green in

Management's Pocket* (the "Report").  The first sentence of the Report summed up Mr. Barnes'

view: "Yongye International, Inc. is a fraud."  To support this conclusion, the Report advanced the

following arguments, among others:

(a)     **"The $35.0mm cash acquisition of Wuchuan Lignite Coal Project is not a

legitimate transaction and appears to be a scheme to transfer funds out of the Company at the

expense of the shareholders."**  While Yongye had previously agreed to acquire from Wuchuan

Shuntong Humic Acid Trading Company, Ltd. ("Wuchuan Shuntong") the rights to explore,

develop, and produce lignite coal resources in Wuchuan County, the Report contends that the

transaction was actually a hoax.  The Report points to a number of facts to evidence its claim, including Wuchuan Shuntong's filings with the Chinese government (the "People's Republic of China State Administration of Industry and Commerce" ("SAIC")) – that, among other things: (i) provide the same contact number for Wuchuan Shuntong and Yongye; and (ii) list an address for Wuchuan Shuntong that is the same as a different humic acid company that is also a supplier of Yongye – and the fact that its owners are two farmers with minimal educations and limited financial resources.  These filings show that Wuchuan Shuntong's "financials are indicative of an insignificant holding company with limited, capital, no revenue, and a short history of existence – not a first tier global coal reserve that is shovel ready for development."

      (b)     **"Intertwined relationships with its two largest suppliers appear to allow the Company to fraudulently manipulate earnings:  Wuchuan Sanda was ordered to cease production by the government and Wuchuan Shuntong does not supply nearly the amount of humic acid claimed by Yongye."**  According to the Report, channel checks and Wuchuan Shuntong's financials do not indicate "the firm is providing anywhere close to the volume of humic acid Yongye claims."  The Report also concluded that based on "Yongye's reported FY09 COGS, it appears that Wuchuan Shuntong should actually have reported revenue of at least $25 million in FY09 if it supplied the volume of humic acid claimed by Yongye Management."  But Wuchuan Shuntong claimed no revenue in its SAIC filings.

      (c)     **"The $32.3mm Hebei Customer List acquisition has limited industrial logic and appears to be another scheme by Yongye Management to falsely manipulate earnings."**  "As Hebei province has been a core market for the Shengmingsu produce since launch, it is not logical that Yongye did not have access to its branded store customer list. . . . [A]ccording to a 2009 interview with Yongye's Chief of Marketing, Mr. Xu Nan, Hebei was the first province

Shengmingsu was marketed in by the Company and it directly hired over 70 retailers in Leting

county for the product launch in September 2008; after this initial success, Yongye utilized the same

sales/marketing structure in other parts of Hebei province.  As part of this provincial product launch,

a sales center was established in Hebei on September 2008 by Yongye.  Next, on 3/13/10, three

months before the supposed acquisition, the Hebei province sales center hosted over 500 distributors

for the Yongye 1H10 Strategic Plan Summit.  This meeting is clear indication Yongye had direct

access to its distributors prior to the customer list acquisition and thus there is no industrial logic to

spend $32.3mm for a phantom customer list."

> (d)      "Yongye falsely claims Shengmingsu, its main fertilizer product, was
developed by 38 scientists at Stanford University:  Absaroka provides a letter from Stanford
University certifying it has no connection to Yongye's Shengmingsu fertilizer and Yongye does not
have permission to utilize Stanford's name, trademark, or images in its advertising and marketing
efforts."

> (e)      "Yongye's Shengmingsu is minimally effective for farmers and Yongye's
product claims do not correspond with reality."

44.      Following the publication of this report, Yongye's stock declined from a close on

May 17, 2011 of $4.58 per share to an intraday low of $3.01 per share on May 19, 2011.  The

volume on May 19, 2011 was 3.6 times the average trading volume.

45.      As a result of defendants' false statements and omissions, Yongye's common stock

traded at artificially inflated prices during the Class Period.  However, after the above revelations

seeped into the market, the Company's shares were hammered by massive sales, sending them down

as much as 68% from their Class Period high of $9.49.

46.     On May 19, 2011, Yongye issued a press release in response to Absaroka's report. With regard to the inaccuracies in the SAIC filings, Yongye contended that such filings are "notoriously inaccurate," and that Wuchuan Shuntong was its major supplier for 2009 and 2010. Yongye also attempted to justify why the contact information filed with the government for Wuchuan Shuntong is actually Yongye's contact information by claiming that Yongye's staff assisted Wuchuan Shuntong with its business registration filings.

47.     Yongye's responses, however, fail to explain how a company that -- as claimed by Yongye -- earns millions of dollars in revenue as Yongye's major supplier must rely on another company, *i.e.*, Yongye, to file its forms with the SAIC. Similarly, Yongye's claim that it purchased the distributors' customer list because it was contractually obligated to in June 2010, still fails to explain why it entered into this contract after the names and identities of over 500 distributors were known to Yongye in March 2010, three months beforehand.

LOSS CAUSATION/ECONOMIC LOSS

48.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Yongye common stock and operated as a fraud or deceit on Class Period purchasers of Yongye common stock by misrepresenting the Company's business and prospects. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Yongye common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Yongye common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

49.     Yongye's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

50.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Yongye who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## ADDITIONAL SCIENTER ALLEGATIONS

51.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Yongye, their control over, and/or receipt and/or modification of Yongye's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Yongye, participated in the fraudulent scheme alleged herein.

- 18 -

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

52.     Lead Plaintiffs incorporate ¶¶1-51 by reference.

53.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Yongye common stock during the Class Period.

55.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Yongye common stock.  Lead Plaintiffs and the Class would not have purchased Yongye common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

56.     Lead Plaintiffs incorporate ¶¶1-55 by reference.

57.     The Individual Defendants acted as controlling persons of Yongye within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Yongye common stock, the Individual Defendants had the power and authority to cause Yongye to engage in the wrongful conduct complained of herein.  Yongye controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Lead Plaintiffs and the members of the Class damages, including interest;

C.     Awarding Lead Plaintiffs reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  December 12, 2011            ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                     SAMUEL H. RUDMAN
                                     DAVID A. ROSENFELD
                                     CHRISTOPHER M. BARRETT


                                     _____
                                          DAVID A. ROSENFELD

                                     58 South Service Road, Suite 200
                                     Melville, NY  11747
                                     Telephone:  631/367-7100
                                     631/367-1173 (fax)

                                     *Lead Counsel for Lead Plaintiffs*

- 20 -

## CERTIFICATE OF SERVICE

I, Kelly Stadelmann, hereby certify that on December 12, 2011, I caused a true and correct copy of the attached:

Consolidated Amended Complaint for Violation of the Federal Securities Laws to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to counsel listed below.

Bruce D. Angiolillo
Jonathan K. Youngwood
Craig Waldman
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017

Kelly Stadelmann
Kelly Stadelmann